Beverly BREWER, Respondent,

v.

MISSOURI TITLE LOANS, Appellant.

No. SC 90647.

Supreme Court of Missouri,
En Banc.

March 6, 2012.

Jonathan F. Andres and Martin M. Green, Green Jacobson PC, St. Louis, for Missouri Title Loans.

John Campbell, John Simon and Erich Vieth, The Simon Law Firm, St. Louis, for Brewer.

Gregory C. Mitchell, Jamie J. Cox and Johnny K. Richardson, Brydon, Swearengen & England PC, Jefferson City, for Missouri Automobile Dealers' Association.

RICHARD B. TEITELMAN, Chief Justice.

Missouri Title Loans, Inc. appeals a judgment finding that a class arbitration waiver contained in its loan agreement, promissory note and security agreement (agreement) is unenforceable. In *Brewer v. Missouri Title Loans, Inc.*, 323 S.W.3d 18 (Mo. banc 2010), this Court affirmed the judgment insofar as it held that the class arbitration waiver is unconscionable and reversed that part of the judgment ordering that the claim be submitted to an arbitrator to determine suitability for class arbitration. This Court held that the appropriate remedy was to strike the entire arbitration agreement.

The United States Supreme Court vacated *Brewer* in *Missouri Title Loans, Inc. v. Brewer*, —— U.S ——, 131 S.Ct. 2875, 179 L.Ed.2d 1184 (2011), and remanded the case to this Court for further consideration in light of *AT & T Mobility, LLC v. Concepcion*, —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). Applying *Concepcion*, this Court finds that the presence and enforcement of the class arbitration waiver does not make the arbitration clause unconscionable. This Court instead applies traditional Missouri contract law in looking at the agreement as a whole to determine the conscionability of the arbitration provision. This Court holds that Brewer has demonstrated unconscionability in the formation of the agreement. The appropriate remedy is revocation of the arbitration clause contained within the agreement. Consequently, the judgment is affirmed in part and reversed in part, and the case is remanded.

## FACTS

Beverly Brewer borrowed $2,215 from the title company. The loan was secured by the title to Brewer's automobile. The annual percentage rate on the loan was 300 percent. The agreement provided that Brewer must resolve any claim against the title company in binding, individual arbitration governed by the Federal Arbitration Act (the act). No customer ever successfully has renegotiated the terms of the contract, including the arbitration provisions. Although the agreement provided that Brewer waived her right to litigate a dispute in court, the title company specifically retained its "right to seek possession of the Collateral in the event of default by judicial or other process including self-help repossession." In other words, the title company may utilize the courts to repossess the customer's vehicle, but the customer must go to arbitration to complain about violations of its rights under the contract.

In addition, the agreement stated that "[t]he parties agree to be responsible for their own expenses, including fees for attorneys, experts and witnesses." Unlike some arbitration contracts, such as the contract at issue in *Concepcion*, the agreement did not provide an attorney fee multiplier or guaranteed minimum recovery if the consumer is awarded more than the title company's last offer. The arbitration contract in *Concepcion* provided that a consumer who is awarded more than AT & T's last offer is entitled to a minimum recovery of $7,500 and to double his or her attorney's fees. *Concepcion*, 131 S.Ct. at 1744. The cumulative real-world effect of the arbitration provisions in this case is that a consumer's minimum and maximum recovery from the title company are identi-

cal—$0.00—for no consumer ever has filed an individual claim for arbitration against the title company.

Brewer made two payments to the title company of more than $1,000, but the payment only reduced her loan principal by 6 cents. Brewer filed a class action petition against the title company alleging violations of numerous statutes, including the state merchandising practices act. The title company filed a motion to dismiss or to stay the claims and to compel Brewer to arbitrate her claims individually. The trial court held a hearing and entered a judgment finding the class arbitration waiver in the loan agreement unconscionable and unenforceable. The trial court also considered a number of the other aspects of the clause, finding that it would be difficult for a consumer to understand that there was a disparity of bargaining power, that the provision was one-sided because only customers gave up their rights while the title company could pursue self-help or relief in the courts, and that the title company had admitted that the provision that each party be responsible for its own costs and attorney's fees in arbitration placed a high burden on consumers. It also found that they too rendered the agreement unconscionable when considered as an individual action. The court ordered the claim to proceed to arbitration to determine whether it was suitable for class arbitration.

The title company appealed, asserting that the act preempted the trial court's decision, that the class arbitration waiver was not unconscionable, and that the waiver was a valid and permissible exculpatory clause under Missouri law. This Court held that the class arbitration waiver was unconscionable and struck the arbitration agreement in its entirety.

The United States Supreme Court granted the title company's petition for writ of certiorari. *Mo. Title Loans, Inc. v.*

*Brewer*, —— U.S. ——, 131 S.Ct. 2875, 179 L.Ed.2d 1184 (2011). The Court vacated *Brewer I* and remanded the case to this Court for further consideration in light of *Concepcion*, 131 S.Ct. 1740.

On remand, the title company asserts that the act wholly preempts Missouri's common law of unconscionability. Alternatively, the title company asserts that the availability of statutory attorney's fees negates Brewer's unconscionability defense because the fee provisions make it possible for consumers with small dollar claims to obtain counsel. Before addressing the title company's arguments, this Court must first address the law established in *Concepcion*.

## ANALYSIS

### I. *AT & T v. Concepcion*

Determining the law established in *Concepcion* is complicated. Justice Scalia authored an opinion joined by Chief Justice Roberts and justices Kennedy, Alito and Thomas, but Justice Thomas also filed a concurring opinion in which he indicated that, although he concurred in Justice Scalia's opinion, he suggested a slightly different analysis than Justice Scalia. *Concepcion*, 131 S.Ct. at 1754 (Thomas, J., concurring). Justice Breyer filed a dissenting opinion, in which justices Ginsbug, Sotomayor and Kagan joined.

As a result, *Concepcion* is best understood by considering Justice Scalia's majority opinion as further informed by Justice Thomas' concurrence. Both opinions, for slightly different reasons, stand for the proposition that the act generally does not permit a state to bar class action waivers by finding an arbitration agreement unconscionable on the basis of a class action waiver alone. The Scalia opinion does not state, however, that the federal act otherwise preempts traditional state law defens-

es to contract formation such as unconscionability, duress or fraud, and Justice Thomas is clear that he would apply those defenses. But *Concepcion* teaches these defenses cannot be used in a way that would hold otherwise valid arbitration agreements unenforceable for the sole reason that they bar class relief. That was what had happened in *Concepcion.*

In *Concepcion,* the plaintiffs sued AT & T in federal district court alleging they improperly were charged sales tax on the retail value of cellular phones provided for free under the terms of their service contract. *Id.* at 1744. The plaintiffs' suit was consolidated with a class action alleging in part that AT & T had engaged in false advertising and fraud by charging sales tax on the phones it had advertised as free. *Id.* AT & T filed a motion to compel individual arbitration pursuant to its contract with the plaintiffs. The district court specifically found that the arbitration agreement "was 'quick, easy to use' and likely to 'promp[t] full or ... even excess payment to the customer without the need to arbitrate or litigate.'" *Id.* at 1745. The district court also found that the provision of a $7,500 premium in the event the consumer was awarded more than AT & T's final written settlement offer served as "substantial inducement" for the consumer to pursue individual arbitration as opposed to class arbitration. *Id.* Although individual arbitration was more beneficial to a consumer than class arbitration, the district court held that the arbitration provision was unconscionable under the California

Supreme Court's decision in *Discover Bank v. Superior Court,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005). *Id.*

■ Given this factual context, the question framed by the Scalia opinion is "whether § 2 [of the ACT] preempts California's [*Discover Bank* ] rule classifying most collective-arbitration waivers in consumer contracts as unconscionable." *Id.* at 1746. *Discover Bank* held that a class action waiver in a consumer contract of adhesion is unconscionable when consumer claims against the defendant are predictably small and the plaintiff ·alleges a scheme to cheat consumers. *Id.* Notably absent from the formulation of the *Discover Bank* rule is any finding that the consumer is worse off under individual arbitration as opposed to class arbitration or that the individual terms of the arbitration agreement are otherwise onerous or unfair. *Id.* at 1750, 1753. The practical effect of the *Discover Bank* rule, therefore, is to invalidate class arbitration waivers in most consumer contracts even if traditional factors of unconscionability are absent.[1]

■ The lack of any requirement of showing actual unconscionability meant that *Discover Bank* created an essentially categorical requirement of class arbitration, which resulted in class arbitration being "manufactured by *Discover Bank,* rather than consensual...." *Id.* at 1750. Requiring class arbitration under these circumstances sacrifices the federal act's goals of facilitating the prompt, informal resolution of disputes while also substantially disadvantaging defendants who did

---

1. Missouri courts have identified a number of factors indicating unconscionability. For instance, high pressure sales tactics, unreadable fine print, misrepresentation or unequal bargaining positions all indicate deficiencies in the making of a contract. *See Whitney v. Alltel Commc'ns, Inc.,* 173 S.W.3d 300, 308 (Mo.App.2005). Courts also consider whether the terms of an arbitration agreement are

unduly harsh. *Id.* This is a fact-specific inquiry focusing on whether the contract terms are so one-sided as to oppress or unfairly surprise an innocent party or which reflect an overall imbalance in the rights and obligations imposed by the contract at issue. *Woods v. QC Financial Services, Inc.,* 280 S.W.3d 90, 96 (Mo.App.2008).

not consent to class arbitration in the first instance. *Id.* at 1751–52.[2] In addition to disadvantaging defendants, the *Discover Bank* rule can disadvantage consumers by requiring a court to find individual arbitration unconscionable even if, like the arbitration contract in *Concepcion,* the consumer is provided with favorable terms for individual arbitration. *Id.* at 1753. The net result of applying *Discover Bank* is that class arbitration waivers are rarely enforced. Instead, defendants are required to submit to procedures to which they did not consent, and consumers may be required to participate in class arbitration even if individual arbitration is more favorable to their interests. Consequently, the majority opinion held that the act preempted California's *Discover Bank* rule "[b]ecause it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . .'" *Id.* (citations omitted).

Although the majority held that the *Discover Bank* rule was preempted by the federal act, it does not follow, as the title company contends, that all state law unconscionability defenses are preempted by the federal act in all cases. First, the expressly stated issue in *Concepcion* was whether California's *Discover Bank* rule was preempted, not whether all state law unconscionability defenses are preempted. The *Discover Bank* rule imposed a unique obstacle to arbitration because, in practice, it conditioned "the enforceability of certain arbitration agreements on the availability of class wide arbitration procedures," *Concepcion,* 131 S.Ct. at 1744, even if the arbitration contract at issue provides a consumer with more favorable terms in individual arbitration than in class arbitration. Not all state law contract defenses require class wide arbitration to the detriment of both the defendant and the plaintiff consumer. Accordingly, consistent with the stated issue in *Concepcion,* the Supreme Court's holding was expressly limited to finding that "California's *Discover Bank* rule is preempted by the act." *Id.* at 1753.

Second, the majority specifically acknowledged that the § 2 saving clause "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 1746, (citing *Doctor's Assoc's., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)). Holding that the § 2 saving clause preempts all state law unconscionability defenses would be inconsistent with both the saving clause and the majority's express recognition of unconscionability as one of the generally applicable contract defenses that retains vitality under the § 2 saving clause.

Finally, the majority opinion discusses in detail the many ways in which the arbitration provisions at issue in *Concepcion* are fair and reasonable and do not lead to an unconscionable result. *Id.* at 1753. This discussion would be superfluous if the majority intended to establish a rule completely preempting all state law uncon-

---

**2.** As with any contract, the legally enforceable obligations of the parties are defined by mutual consent. "[I]t follows that a party may not be compelled under the ACT to submit to class arbitration unless there is a contractual basis for concluding the party agreed to do so." *Stolt–Nielsen v. AnimalFeeds Int'l Corp.,* — U.S. —, 130 S.Ct. 1758, 1775, 176

L.Ed.2d 605 (2010). Therefore, a fundamental problem with the *Discover Bank* rule is that it requires courts to invalidate contractual provisions requiring individual arbitration and to order class arbitration even though the defendant, by including a class waiver, expressly withheld consent to class arbitration.

scionability defenses. Therefore, the *Concepcion* majority recognizes that a case-by-case approach provides the appropriate analytical framework for assessing the applicability of state law contract defenses pursuant to the § 2 saving clause.

For these reasons, title company is incorrect in its assertion that the majority opinion compels the conclusion that the federal act requires state courts to replace the essentially categorical *Discover Bank* rule requiring class arbitration with another categorical rule requiring individual arbitration in every case, irrespective of the application of generally applicable contract defenses specifically retained by the § 2 saving clause. Instead, analysis of whether a particular state contract defense is preempted because it "stand[s] as an obstacle to the accomplishment of the act's objectives" depends on the factual posture of individual cases.

In his concurring opinion, Justice Thomas agrees that the federal act preempts state law contract defenses rooted in public policy concerns regarding arbitration, even if the policy nominally applies to contracts generally. *Id.* at 1754 (Thomas, J., concurring). Like the majority opinion, Justice Thomas notes that state law contract defenses including "fraud, duress, and unconscionability 'may be applied to invalidate arbitration agreements without contravening § 2.'" *Id.* at 1755, n. 1 (quoting *Doctors Assoc's., Inc.*, 517 U.S. at 687, 116 S.Ct. 1652). But Justice Thomas focuses his analysis on the text of the § 2 saving clause. The saving clause refers only to defenses that result in "revocation" of a contract and omits any reference to the "invalidation" or "nonenforcement" of a contract. *Id.* at 1754. Justice Thomas reasons that the text of the saving clause suggests that "the exception does not include all defenses applicable to any contract but rather some subset of those de-

fenses." *Id.* In other words, the federal act requires "enforcement of an agreement to arbitrate unless a party successfully asserts a defense concerning the *formation* of the agreement. . . ." *Id.* at 1755 (emphasis added). "Contract defenses that are unrelated to the making of the agreement—such as public policy—are *not* valid grounds for declining to enforce an arbitration agreement." *Id.* at 1755. Because the *Discover Bank* rule relies on a public policy rationale and does not concern the making of the arbitration agreement, Justice Thomas concludes that the act requires preemption of the *Discover Bank* rule and enforcement of the arbitration provision in AT & T's agreement. *Id.* at 1756.

After setting out this discussion, Justice Thomas nonetheless concurs in Justice Scalia's opinion because the twin foundations of both analyses are the same. First, the federal act does not preempt state law contract defenses pertaining to the formation of a contract. Justice Thomas recognizes this point explicitly, while the majority does so inferentially. The majority holds that the federal act preempts *Discover Bank* because it "stand[s] as an obstacle to the accomplishment and execution the full purposes and objectives of Congress. . . ." *Id.* at 1753. Application of the *Discover Bank* rule has nothing to do with contract formation. Consequently, the Supreme Court's preemption of *Discover Bank* does not preempt all state law defenses to contract formation.

The second and related proposition supported by both opinions is that the federal act preemption analysis requires a case-specific assessment of the arbitration contract at issue. The majority opinion holds that state law contract defenses, including unconscionability, are preempted only if the defense "stand[s] as an obstacle to the accomplishment of the act's objectives."

*Id.* at 1748. The question of whether a state law unconscionability defense stands as "an obstacle to the accomplishment of the act's objectives" requires analysis of the particular facts of the case. Likewise, Justice Thomas' focus on contract formation defenses such as fraud, duress, and unconscionability necessarily requires an analysis of the facts leading to the alleged formation of the contract at issue. Therefore, at a minimum, the rationales of both the majority opinion and Justice Thomas' concurrence permit state courts to apply state law defenses to the formation of the particular contract at issue.

This interpretation is confirmed by the Supreme Court's holding in *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012). In *Marmet*, a state court held that the federal act does not preempt state public policy against pre-dispute arbitration agreements that apply to personal injury and wrongful death claims against nursing homes. 132 S.Ct. at 1203. Alternatively, the state court held that the arbitration agreements were unconscionable. 132 S.Ct. at 1203–04. The Supreme Court reversed the judgment because the state court's public policy rationale is the type of "categorical rule" prohibiting arbitration of a particular type of claim identified in *Concepcion* as "contrary to the terms and coverage of the FAA." 132 S.Ct. at 1204. The Supreme Court remanded the case for consideration of whether, absent the public policy rationale, the arbitration clauses at issue "are unenforceable under state common law principles that are not specific to arbitration and pre-empted by the FAA." 132 S.Ct. at 1204. The Supreme Court's remand for consideration of generally applicable state law contract defenses, such

as unconscionability, confirms that *Concepcion* permits state courts to apply state law defenses to the formation of the particular contract at issue.

For these reasons—and as this Court also holds in *Robinson v. Title Lenders, Inc.*, 364 S.W.3d 505 (Mo. banc 2012) (decided concurrently with this case)—*Concepcion* permits state courts to apply state law defenses to the formation of the particular contract at issue on a case-by-case basis. Accordingly, this Court will analyze the issues in this appeal to determine if, under the factual record presented, Brewer has established a defense to the formation of the agreement's arbitration clause. Because no party has requested remand, and because, unlike in *Robinson*, here the trial court did reach other factual issues in determining that the arbitration clause was unconscionable, the record is sufficient in this case for this Court to determine the conscionability of the arbitration clause.

## II. Standard of Review

The judgment will be affirmed if it is supported by substantial evidence, it is not against the weight of the evidence, and does not erroneously declare or apply the law. *Woods v. QC Fin. Servs., Inc.*, 280 S.W.3d 90, 94 (Mo.App.2008). The issue of whether a dispute is subject to arbitration is subject to de novo review. *Id.*

## III. Defenses to Contract Formation

Unlike *Concepcion*, which concerned the enforceability of a class waiver, the issue in this case is whether the arbitration agreement as a whole is unconscionable.[3] The purpose of the uncon-

---

3. While Missouri courts traditionally have discussed unconscionability under the lens of *procedural* unconscionability, *Woods*, 280

S.W.3d at 94–95, and *substantive* unconscionability, *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 858 (Mo. banc 2006), *Concep-*

scionability doctrine is to guard against one-sided contracts, oppression and unfair surprise. *Cowbell, LLC v. Borc Building and Leasing Corp.*, 328 S.W.3d 399, 405 (Mo.App.2010); *see also Woods*, 280 S.W.3d at 96. Oppression and unfair surprise can occur during the bargaining process or may become evident later, when a dispute or other circumstances invoke the objectively unreasonable terms. In either case, the unconscionability is linked inextricably with the process of contract formation because it is at formation that a party is required to agree to the objectively unreasonable terms.

The evidence in this case supports a determination that the agreement's arbitration clause is unconscionable. There was evidence that the entire agreement—including the arbitration clause—was nonnegotiable and was difficult for the average consumer to understand and that the title company was in a superior bargaining position. Brewer could not negotiate the terms of the agreement, including the terms of the arbitration clause. Indeed, the evidence further demonstrated that no consumer ever successfully had renegotiated the terms of the title company's arbitration contract.

The evidence also demonstrated that the terms of the agreement are extremely one-sided. Unlike in *Concepcion*, in which AT & T shouldered the costs of arbitration and would pay double the customer's attorney's fees if the customer recovered more than AT & T had offered prior to arbitration, the agreement here provides that the parties are to bear their own costs. In *Concepcion*, the arbitration clause waived AT & T's right to seek reimbursement for attorney's fees incurred in defending against a consumer's claim. In contrast, the title company did not waive its right to seek attorney's fees and, therefore, could seek to recover attorney's fees incurred in defending a claim. The fact that no consumer ever has arbitrated a claim against the title company under these terms makes it clear that the agreement stands as a substantial obstacle not just to arbitration but also to the resolution of any consumer disputes against the title company.

The evidence in this case is also fundamentally different from that in *Concepcion* because Brewer presented expert testimo-

*cion* instead dictates a review that limits the discussion to whether state law defenses such as unconscionability impact the *formation* of a contract. In fact, in his concurring opinion, Justice Thomas specifically delineated past precedent of the Supreme Court applying defenses relevant to the *formation* of a contract. 131 S.Ct. at 1755 (Thomas, J. concurring) (noting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) (defenses of fraud, duress and unconscionability could be applied to invalidate arbitration agreements without contravening section 2); *Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 547, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008) (describing fraud and duress as "traditional grounds for the abrogation of [a] contract" that speaks to "unfair dealing at the contract formation stage"); *Hume v. United States*, 132 U.S. 406, 411, 414, 10 S.Ct. 134, 33 L.Ed. 393 (1889) (describing an unconscionable contract as one "such as no man in his senses and not under delusion would make" and suggesting that there may be "contracts so extortionate and unconscionable on their face as to raise the presumption of fraud in their inception" (internal quotation marks omitted))). Accordingly, the analysis in this Court's ruling today—as well as this Court's ruling in *Robinson v. Title Lenders, Inc.*,—no longer focuses on a discussion of procedural unconscionability or substantive unconscionability, but instead is limited to a discussion of facts relating to unconscionability impacting the formation of the contract. Future decisions by Missouri's courts addressing unconscionability likewise shall limit review of the defense of unconscionability to the context of its relevance to contract formation.

ny from three consumer lawyers who testified it was unlikely that a consumer could retain counsel to pursue individual claims. There was no such record in *Concepcion.* A claim such as Brewer's would require significant expertise and discovery, and it would not be financially viable for an attorney because of the complicated nature of the case and the small damages at issue. The title company presented no contrary evidence from attorneys who said they were willing to take such cases other than on a pro-bono or rare voluntary basis.

While the majority opinion in *Concepcion* makes it clear that the unavailability of counsel is not alone sufficient to invalidate the requirement of individual arbitration, it remains one of the relevant considerations in assessing the overall conscionability of an arbitration contract. The *Discover Bank* rule was not preempted because it conditioned the enforceability of an arbitration contract on the availability of an attorney. Instead, the critical flaw leading to the preemption of the *Discover Bank* rule was that it required class arbitration even if class arbitration disadvantaged consumers and was unnecessary for the consumer to obtain a remedy. *Discover Bank,* therefore, was inconsistent with the core purpose of the federal act, which is to ensure enforcement of private arbitration agreements to promote informal, efficient dispute resolution. *Concepcion,* 131 S.Ct. at 1748–1749. Because the purpose of the act is to ensure efficient dispute resolution, the analysis in *Concepcion* assumes the availability of a practical, viable means of individualized dispute resolution through arbitration. In some cases, the availability of counsel is a relevant consideration for determining whether the act's interest in dispute resolution will be satisfied. As noted above, the totality of Brewer's evidence, including the lack of available counsel, demonstrates that there is no practical, viable means of individualized dispute resolution.

The title company asserts that the availability of attorney's fees and punitive damages under the state merchandising practices act negates Brewer's argument that attorneys are unwilling to handle claims such as hers. The title company notes that reported cases indicate that some lawyers are willing to handle cases brought under the federal truth in lending and fair debt collection practices acts and that this proves that statutory damages provide sufficient financial incentive for attorneys to assist consumers in individual, small dollar claims. The deficiency in the title company's argument is that it presents a totally theoretical position that attorneys *should* want to take such cases. Speculation is not a substitute for evidence. In this case, there was specific and uncontradicted evidence before the trial court demonstrating that attorneys were unlikely to take claims such as Brewer's on an individual basis. Even if some attorneys may take some cases because of the potential availability of fees under the merchandising practices act, this does not prove that Brewer would have the benefit of counsel in attempting to obtain a remedy on an individual basis.

Finally, the agreement does not bilaterally provide that any and all disputes between the parties arising out of or related to the agreement must be decided by binding, individual arbitration under the federal act. Instead, the title company drafted the agreement to bind the consumer to individual arbitration for all claims against the title company, but it specifically reserved its right to forego arbitration "to seek possession of the Collateral in the event of default by judicial or other process including self-help repossession." In the context of a title loan transaction, this is a particularly onerous provision because among the lender's chief

remedies in the event of default is either judicial or self-help repossession. The title company reserves its right to obtain its primary remedies through the court system while requiring Brewer to obtain her only meaningful remedy—monetary compensation for the alleged violation of consumer protection laws—through individual arbitration.[4]

The disparity in bargaining power, in addition to the disparity between Brewer's remedial options and the title company's remedial options, constitutes strong evidence that the agreement is unconscionable. The title company requires Brewer to arbitrate all of her claims in the interests of efficient, streamlined dispute resolution. However, when the title company's interests are at stake, the title company is free to discard the efficiencies of arbitration in favor of litigating a claim against Brewer. It is unlikely that the ramifications of such provisions are comprehended by the average consumer or comport with the reasonable expectations of an average member of the public.

The arbitration contract at issue in *Concepcion* is fundamentally different from the agreement in this case. In *Concepcion*, the contract provided an informal 30–day dispute resolution procedure. *Id.* at 1744. If the consumer was dissatisfied, he or she could seek arbitration by filling out a form provided on AT & T's website. *Id.* AT & T would pay all costs of arbitration of any non-frivolous claim. *Id.* Arbitration would occur in the customer's home county and could be by telephone, in person or on paper for small claims. *Id.* AT & T never could seek attorney's fees, while the con-

sumer was entitled to double fees if awarded more than AT & T's last offer. *Id.* Customers who utilized the opportunity to resolve their claims either informally or through this arbitration process, were "essentially guarantee[d] to be made whole." *Id.* at 1753, citing *Laster v. AT & T Mobility, LLC,* 584 F.3d 849 856, n. 9 (9th Cir.2009).

In contrast, the agreement at issue in this case does not provide for informal complaint resolution. Arbitration is required for any dispute, at the cost of the customer, while the title company has a choice of simply repossessing the collateral by force or through suit in court rather than using arbitration. The title company never pays the costs of arbitration or attorney's fees for the customer, even if the customer wins. The obstacle to dispute resolution posed by these provisions is illustrated by the simple fact that no customer has utilized the arbitration clause to recover. As arbitration is the only remedy, this means that no customer has obtained relief. As a result, far from fulfilling the purpose of the federal act of providing a prompt and informal method of resolving disputes, the arbitration clause here is itself "an obstacle to the accomplishment of the act's objectives."

For these reasons, this Court finds that the unconscionable aspects of the agreement indicate that it is a contract that no person "in his senses and not under delusion would make." *Concepcion,* 131 S.Ct. at 1755 (Thomas, J. concurring)(citing *Hume v. United States,* 132 U.S. 406, 411, 10 S.Ct. 134, 33 L.Ed. 393 (1889)). Brewer

---

4. Not only does the title company retain the right to seek judicial remedies, the title company further protects its interests by charging an extremely high interest rate to compensate for the risks inherent in its lending practices. While there is no allegation that the 300–percent annual interest rate that the title com-

pany charges is illegal, it plainly illustrates the fact that the agreement is drafted to limit substantially the remedial options of often financially distressed consumers while allowing the title company substantial latitude in protecting its financial interests.

has established, therefore, that the circumstances under which the agreement was made are unconscionable. The arbitration clause of the agreement is unconscionable and unenforceable.

## CONCLUSION

The judgment finding the class arbitration waiver unconscionable is affirmed because the entire arbitration agreement is unconscionable and unenforceable. The judgment is reversed, however, to the extent that it severs the class arbitration waiver and requires an arbitrator to determine the propriety of class arbitration. The case is remanded.

STITH, J., PFEIFFER, Sp.J., and WOLFF, Sr.J., concur.

FISCHER, J., dissents in separate opinion filed.

BRECKENRIDGE, J., concurs in opinion of FISCHER, J.

PRICE, J., dissents in separate opinion filed.

RUSSELL and DRAPER, JJ., not participating.

ZEL M. FISCHER, Judge, dissenting.

The circuit court entered its judgment in this case on August 5, 2009. That judgment, which struck down the prohibition of the class arbitration, was affirmed by a majority of this Court, but I joined the dissent authored by Judge Price. The United States Supreme Court thereafter issued its decision in *AT & T Mobility, LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), granted certiorari, vacated this Court's opinion in *Brewer v. Missouri Title Loans,* 323 S.W.3d 18 (Mo. banc 2010) (*Brewer I*) and remanded for further proceedings consistent with *Concepcion.* In my view, and to be consistent with *Concepcion* and this Court's unanimous opinion in *Robinson v. Title Lenders,* 364 S.W.3d 505 (Mo. banc 2012) (decided concurrently with this case), the circuit court's judgment must be reversed and remanded to the circuit court for further factual determinations because the circuit court admittedly and explicitly "considered only the arbitration clause of defendant's contract, and [did] not consider the contract as a whole." Circuit court judgment at 2.

The circuit court's judgment was very specific as to the issue it decided. "The issue to be decided is whether the arbitration clause of Missouri Title Loans, Inc. is unconscionable and therefore unenforceable." Circuit court judgment at 1. The circuit court, as specifically stated above, did not consider whether the contract as a whole was unconscionable.

The principal opinion expressly considered "traditional Missouri contract law in looking at the agreement as a whole to determine the conscionability of the arbitration provision," and then went on to factually determine plaintiff "has demonstrated unconscionability in the formation of the Agreement." Op. at 487.

The dissenting opinion authored by Judge Price recognizes section 2 of the FAA preserves agreements to arbitrate to be invalidated only by " 'generally applicable contract defenses such as fraud, duress, or unconscionability,' but not by defenses that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.' " Op. at 497. Therefore, the opinion authored by Judge Price would "enforce the contract as written." *Id.* at 497.

In my view, if the circuit court would have had the benefit of the United States Supreme Court's opinion in *Concepcion* and this Court's unanimous opinion in *Rob-*

*inson,* it would have realized the legal necessity to consider the contract as a whole under applicable state law concepts of unconscionability to resolve this case. I am of the view it is the circuit court's prerogative and function to determine all the facts necessary and then apply the law in accordance with these recent case decisions to those facts. Therefore, I would reverse and remand for further proceedings consistent with *Concepcion* and *Robinson.*[1]

**WILLIAM RAY PRICE, JR., Judge,** dissenting.

## I. Introduction

The Federal Arbitration Act ("FAA") states that "an agreement in writing to submit to arbitration ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In *AT & T Mobility, LLC v. Concepcion,* the Supreme Court stated that this section reflects a "federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." —— U.S. ——, ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011). "[C]ourts must place arbitration agreements on an equal footing with other contracts, and *enforce them according to their terms.*'" *Id.* (emphasis added) (internal citations omitted). The FAA and *Concepcion* preclude states from using contract defenses to inhibit the enforcement of agreements to arbitrate. Section 2 of the FAA permits agreements to arbitrate to be invalidated *only* by "generally applicable contract defenses, such as fraud, duress, or unconscionability" but *not* by de-

fenses that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 1746. "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id.* at 1753.

Nonetheless, the majority here, just as in *Brewer I,* strikes down an arbitration clause in an attempt to balance the scales between poor consumers and businesses. *See Brewer v. Missouri Title Loans, Inc.,* 323 S.W.3d 18 (Mo. banc 2010) (*Brewer I*). Regardless of whether this is a laudable goal,[1] it is forbidden by the FAA, *Concepcion* and the law of Missouri because the rule the majority establishes is directed solely at invalidating arbitration agreements.

I dissent. I would enforce the contract as written.

## II. Procedural History

In *Brewer I,* this Court found that a class arbitration waiver—combined with an alleged unavailability of counsel to take an individual arbitration, a small amount of damages, and small fees for the attorney—removed any possible remedy for plaintiff Beverly Brewer. *Brewer I,* 323 S.W.3d at 21. As a result, the Court found that requiring individual arbitration would make the agreement unconscionable. *Id.* at 21–23. The Court struck the entire arbitration agreement for these substantive, not procedural, considerations and allowed Brewer to proceed with class action litigation. *Id.* at 24.[2] *Brewer I* specifically held that "the unconscionable aspects of the arbitration contract are a result of the

---

1. The requirement to remand this case is also consistent with the recent United States Supreme Court case in *Marmet Health Care Center, Inc. v. Brown,* 565 U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012).

1. I do not contest that some of the terms in the title loan agreement are harsh.

2. All of the reasoning from my dissent in *Brewer I* applies to this decision as well.

class arbitration waiver." *Id.* This holding was vacated by the United States Supreme Court and remanded back to this Court for further consideration in light of *AT & T Mobility v. Concepcion. Missouri Title Loans, Inc. v. Brewer,* —— U.S. ——, 131 S.Ct. 2875, 179 L.Ed.2d 1184 (2011).

*Concepcion* addressed an issue similar to the one in *Brewer I.* California courts recently had established the *"Discover Bank* rule," which "classif[ied] most collective-arbitration waivers in consumer contracts as unconscionable." *Concepcion,* 131 S.Ct. at 1746. By applying the *Discover Bank* rule, courts could invalidate class arbitration waivers and compel class arbitrations by allowing a consumer to demand class procedures after the contract had been signed. *Id.* The rule allowed California courts to apply California state-law unconscionability analysis in a way that singled out and disfavored arbitration agreements. *Id.* at 1747–48.

The Supreme Court found section 2 of the FAA preserves "generally applicable contract defenses" such as California's unconscionability law prior to the *Discover Bank* rule, which requires a showing of both procedural and substantive unconscionability. *Id.* at 1746. However, state law contract defenses that inhibit the accomplishment of the FAA's objectives and the enforcement of agreements to arbitrate are preempted. *Id.* at 1747. The *Discover Bank* rule stood as "an obstacle to the accomplishment of the FAA's objectives" and thereby was preempted by the FAA. *Id.* at 1753. The ruling in *Concepcion* required the holding from *Brewer I,* that the class arbitration waiver caused the arbitration agreement to be unconscionable, be overturned.

The Supreme Court reaffirmed *Concepcion* and overturned a state court ruling in the recent case of *Marmet Health Care Center, Inc., et al. v. Brown, et al.,* 565 U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012). The state court below had ruled that arbitration agreements in nursing home contracts were unenforceable because it was against state public policy to require arbitration of personal injury or wrongful death claims. *Brown v. Genesis Healthcare Corp.,* 724 S.E.2d 250 (W.Va. 2011). The state court held that, in the alternative, the arbitration agreements were unenforceable because they were unconscionable. The Supreme Court rejected both alternative judgments. First, holding that personal injury or wrongful death claims cannot be arbitrated creates a "categorical" state law that contravenes the FAA, and therefore is displaced by the FAA. Op. at 487–88. Second, it was "unclear" to the Supreme Court how the invalid, categorical rule against arbitration agreements influenced the finding of unconscionability. *Id.* The Supreme Court remanded for the state court to consider whether the arbitration clauses are unenforceable under state common law principles "not specific to arbitration and preempted by the FAA." Op. at 492.

Today, this Court addresses another case with a trial court ruling that is inconsistent with *Concepcion—Robinson v. Title Lenders,* 364 S.W.3d 505 (Mo. banc 2012) (decided concurrently with this case).[3] In *Robinson,* the trial court found a class arbitration waiver caused an arbitration agreement between a consumer and a business to be unconscionable. *Id.* at 509. Because *Concepcion* "instructs clearly that a court cannot invalidate an arbitration agreement on the sole basis

3. *See Robinson* for a full discussion of the impact *Concepcion* makes on the interpreta-

tion of agreements to arbitrate in Missouri.

that it contains a class waiver," the enforceability of an arbitration agreement is instead tested though a "lens of ordinary state-law principles that govern contracts." *Id.* at 515. *Robinson* was remanded for a hearing to determine whether the "arbitration agreement is improper in light of generally applicable contract defenses" such as fraud, duress, or unconscionability. *See id.* at 515, 517–18.

While the majority here claims to fall in line with *Robinson, Concepcion* and *Marmet,* it reaches the opposite result from all three cases on similar facts. By striking Brewer's arbitration agreement, allowing the arbitration agreement to influence the finding of unconscionability, and not analyzing this case according to traditional Missouri unconscionability principles, the majority does not follow the law established in *Concepcion,* reaffirmed in *Marmet* and articulated in *Robinson.*

### III. Analysis

#### A. *Concepcion's* Holding

Despite the majority's claims to the contrary, *Concepcion* is not difficult to understand or apply. It provides that an agreement to arbitrate may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion,* 131 S.Ct. at 1746. *Concepcion* instructs us to look to state law principles when deciding if an agreement to arbitrate may be unenforceable because it is unconscionable. *Id.* Missouri state law principles of unconsciona-

bility apply, unless those principles apply only to agreements to arbitrate or they derive meaning just because an agreement to arbitrate is at issue.

While Justice Thomas wrote separately in *Concepcion,* he expressly concurred in the majority opinion and made it the controlling statement of law.[4] Justice Thomas, however, individually advocated that only issues related to the "making of the agreement" should be grounds for revocation of an agreement to arbitrate. *Id.* at 1754 (Thomas, J., concurring) (reasoning that an agreement to arbitrate should be enforced unless a defense concerning the formation of the agreement applies, such as fraud, duress or mutual mistake).

The majority of this Court uses Justice Thomas' concurrence to combine the issues of substantive and procedural unconscionability and do away with the requirement that the contract be procedurally unconscionable. The majority's reliance on the concurrence is misplaced, though, as Justice Thomas argued that a deficiency in the "formation of the contract" must exist to find the agreement unconscionable. Traditional procedural unconscionability issues are those that reflect problems in the formation of the contract.[5] The majority fails to establish that Brewer has proven a defense regarding the formation of the agreement, thereby failing to meet Justice Thomas' suggested test, the *Concepcion* majority's test and the requirements of unconscionability under Missouri law.

#### B. Missouri Requires Both Procedural and Substantive Unconscionability

An unconscionable contract is unenforceable. *State ex rel. Vincent v. Schneider,*

---

4. Realizing that "the Court's test will often lead to the same outcome" as his "textual interpretation," Justice Thomas joined the majority to "give lower courts guidance from a majority of the Court." *Concepcion,* 131 S.Ct. at 1754 (Thomas, J., concurring).

5. "[P]rocedural unconscionability in general is involved with the *contract formation process.*" *Funding Sys. Leasing Corp. v. King Louie Int'l, Inc.,* 597 S.W.2d 624, 634 (Mo. App.1979) (emphasis added).

194 S.W.3d 853, 858 (Mo. banc 2006). An unconscionable contract is "one in which no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept on the other, or one where there is an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *Cicle v. Chase Bank USA*, 583 F.3d 549, 554 (8th Cir.2009) (internal quotations and citations omitted).

Traditional unconscionability law in Missouri requires a showing that the contract is both procedurally and substantively unconscionable. *Funding Sys. Leasing Corp. v. King Louie Int'l, Inc.*, 597 S.W.2d 624, 633–34 (Mo.App.1979); *see also Brewer I* (Price, J., dissenting) and cases cited therein. Substantive unconscionability concerns the actual terms of the contract, asking whether the terms are so one-sided that they are unenforceable as a matter of public policy. *Vincent*, 194 S.W.3d at 858.[6]

Procedural unconscionability, on the other hand, deals with the formalities of making the contract and focuses on whether the parties had a voluntary and sufficient meeting of the minds to bind each other to the terms of the writing. "Procedural unconscionability focuses on things such as high pressure sales tactics, unreadable fine print, or misrepresentation among other unfair issues in the contract formation process." *Repair Masters Const., Inc. v. Gary*, 277 S.W.3d 854, 857 (Mo.App.2009) (internal citations omitted). A showing of procedural unconscionability is required; otherwise, a party is presumed to know

what he signed and that he agreed to it. *See Sanger v. Yellow Cab Co., Inc.*, 486 S.W.2d 477, 481 (Mo. banc 1972). The idea is that if a contract provision is so substantively unfair that "no man in his senses" would agree to it, only deception and like acts would have caused him to agree to it; and that deception must be shown as a matter of fact.

## C. The Majority's Reasons for Finding the Contract Unenforceable Fail

The majority points to numerous facts to avoid the holding of *Concepcion* and Missouri law. First, it claims that procedural issues existed with the contract, in that the entire contract was non-negotiable; the contract was difficult to understand; and the contract was a product of Missouri Title Loan's (the title company's) superior bargaining position. Next, the majority finds the contract was substantively unconscionable in that the terms were one-sided and favored the title company because it did not waive the right to seek attorneys' fees; the title company retained the right to use the judicial process to repossess the automobiles that secured their loans; and the contract provided for a high interest rate. Finally, the majority attempts to bolster its holding by stating that the class arbitration waiver shields the title company from liability and removes any remedy for consumers, as attorneys are unlikely to take a single arbitration case that has small damages and results in small attorneys' fees. Upon even the most cursory examination, the majority's procedural and formational arguments fall away.

---

**6.** Courts and scholars alike have misconstrued *Vincent*. That case did not eliminate the requirement that some procedural unconscionability must be shown to invalidate a contract. *Vincent*, 194 S.W.3d at 858. Procedural unconscionability was simply not at issue in the appeal of that case. *See Brewer I*

(Price, J., dissenting) and discussion therein; *cf.* Whitney Hampton, *A New Twist on an Old Approach: Missouri's Use of Unconscionability and Consent in the Class Arbitration Waiver Analysis*, 2011 J. Disp. Resol. 209, 213 (2011).

### 1. The arbitration agreement is not procedurally unconscionable

#### a. *Brewer did not prove that the contract is non-negotiable*

When evaluating possible procedural unconscionability in the formation of a contract, courts look to the *plaintiff's actual experiences* with the business defendant. *See Funding Sys. Leasing Corp.*, 597 S.W.2d at 635. For example, testimony that an arbitration provision never has been negotiated by consumers "does not prove the negative" or thereby prove that the contract was non-negotiable as to one specific consumer. *Vincent*, 194 S.W.3d at 857.

Brewer does not claim that she, personally, tried to negotiate the contract and failed. Neither has Brewer provided evidence that she could not go to some other lender and obtain a different contract. *See* discussion in III.C.1(c). Although the majority claims that "no customer" has negotiated a contract with the title company, this does not prove that Brewer's contract was "non-negotiable." Finally, there is no evidence that the title company used tactics designed to coerce Brewer into agreeing to the contract without negotiating the terms. Without some evidence of coercion, or a failed attempt to negotiate, Brewer does not show that the contract was non-negotiable in a way that makes the agreement procedurally unconscionable.

#### b. *Brewer did not prove she did not understand the contract*

A simple misunderstanding of a contract does not create an "unfair issue in the contract formation process" that establishes procedural unconscionability. *See Repair Masters Const., Inc.*, 277 S.W.3d at 857. In addition, "[t]he failure to read a document prior to signing it is not a defense, and does not make a contract voidable, absent fraud." *Id.*[7] Even if a consumer does not read a contract he signs with a business, he may expect that it contains an arbitration agreement. "[A]n average person would reasonably expect that disputes arising out of an agreement [between an individual and a business] might have to be resolved in arbitration." *Swain v. Auto Services, Inc.*, 128 S.W.3d 103, 107–08 (Mo. App.2003).

The majority speculates that it is "unlikely" that the contract could be "comprehended by the average consumer" or that it "comport[s] with the reasonable expectations of an average member of the public." However, this statement is totally unrelated to the present case because we have specific facts on which we can rely.

Brewer did not claim she misunderstood the contract. In fact, Brewer admits that she did not even read the contract. If Brewer had read the contract, she would have seen the class arbitration waiver in the loan agreement was in bold, capital letters, and that bold, capital letters immediately above the signature line stated that the agreement "contains a binding arbitration provision." *Cf. Whitney v. Alltel Commc'ns, Inc.*, 173 S.W.3d 300, 308 (Mo. App.2005) (finding an agreement to arbitrate unconscionable when it was "in fine print on the back side of the sheet sent to plaintiff because this was "insufficient to call its customers' attention" to the provision).

---

7. *See also Sanger*, 486 S.W.2d at 481 ("The rule is that the one who signs a paper, without reading it, if he is able to read and understand, is guilty of such negligence in failing to inform himself of its nature that he cannot be relieved from the obligation contained in the paper thus signed, unless there was something more than mere reliance upon the statements of another as to its contents." (internal quotations omitted)).

### c. Brewer did not prove the contract was a result of a disparity in bargaining power

An unconscionable contract of adhesion is one that is created by a stronger party with greater bargaining power and imposed on a weaker party. *Vincent*, 194 S.W.3d at 857. The weaker party is unable to look elsewhere for a more attractive contract, and the terms in the contract "unexpectedly or unconscionably" limit the obligations of the stronger party. *Id.; see also Swain*, 128 S.W.3d at 108 ("[t]he service plan was presented as *the only warranty available* on the car in a mostly-preprinted form ..." (emphasis added)). This is a matter of fact that must be proven to the trial court; one "cannot simply allege that a pre-printed contract is a contract of adhesion and offer no other proof on the matter." *Vincent*, 194 S.W.3d at 857.

The majority mentions that the parties here had a "disparity in bargaining positions" and that the title company was in a "superior bargaining position." However, neither the trial court nor the majority state how this bargaining position affected the *process* of forming the contract. Brewer stated she could have looked elsewhere for a loan agreement with different terms; in fact, she compiled a list of 20 competing companies offering the same service. Brewer never claimed that all of these companies used the same contract or included the same terms, leaving her with no possible alternative. Finally, an un-

equal balance of power between the parties, alone, does not support a finding of unconscionability post-*Concepcion*. *See Robinson*, 364 S.W.3d at 517, fn. 14.

### 2. The alleged substantively unconscionable terms do not justify striking the arbitration agreement

### a. Finding some terms substantively unconscionable interferes with the parties' right to contract for those terms

"Courts should not interfere with a party's right to contract so long as the contract is not otherwise void." *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 627 (Mo. banc 1997). When the terms of a contract are clear, "the court is bound to enforce the terms as written." *Id.* at 626–27. There is no requirement in Missouri that contract terms be "an exchange of reciprocal promises." *See Vincent*, 194 S.W.3d at 859, quoting *Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 181 (3d Cir.1999).

The majority attacks many of the contract terms, calling them unconscionable and one-sided. Of those terms, though, it is disingenuous to fault the title company for the need to use the judicial process to repossess vehicles that secure loans.[8] This is not evidence of a contract containing one-sided terms to benefit the title company; arbitration simply cannot provide for a secured creditors' replevin right.[9] *See*

---

**8.** The law of secured transactions is highly regulated. Allowing creditors to utilize the court process for repossession is intended to protect the consumer, should he default on a loan secured by his personal vehicle. *See* comment to section 400.9–609, RSMo Supp. 2009. In contrast, the use of nonjudicial foreclosures is criticized by consumer protection advocates because of the risk that they will not be preformed peaceably. *See* Christopher P. Bennett, *The Buck Stops Here—Peaceable*

*Repossession is a Nondelegable Duty*, 63 Mo. L.Rev. 785, 797 (1998).

**9.** *See also* R. Wilson Freyermuth, *Foreclosure by Arbitration?*, 37 PEPP. L. REV. 459, 480 (2010), for a similar discussion in the context of commercial mortgages ("To this point, standard mortgage forms do not contain arbitration clauses at all, or, if they do, they 'carve out' foreclosure from their scope.").

*also Marmet,* 565 U.S. ——, 132 S.Ct. at 1202–03 (noting that the nursing home arbitration agreement required parties to arbitrate all disputes *except* claims by the defendant to collect late payments owed by the patient).

The majority also concludes that the provisions retaining the title company's right to seek attorneys' fees and establishing the high interest rate are substantively unconscionable. However, this ignores the fact that Brewer could have gone to at least 20 different companies—which she had researched and listed—to find better terms.

The majority compares these provisions with ones from the contract the Supreme Court enforced in *Concepcion,* noting that in that case, AT & T agreed to waive the right to attorneys' fees and to shoulder the costs of arbitration. However, the Supreme Court did *not* state that these consumer-favorable provisions are required for an agreement to arbitrate to be found conscionable. Furthermore, the parties are not required to make promises equal in consideration as long as the contract is supported by consideration.

### b. Finding individual arbitration does not provide a remedy contravenes the FAA and Concepcion

The core purpose of the FAA is to "ensure that private arbitration agreements are enforced according to their terms." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* —— U.S. ——, ——, 130 S.Ct. 1758, 1763, 176 L.Ed.2d 605 (2010). A contract defense may not be used to strike down an arbitration clause if that defense would "apply only to arbitration or that derive[s] meaning from the fact that an agreement to arbitrate is at issue." *Concepcion,* 131 S.Ct. at 1746. The generally applicable contract defenses that may invalidate agreements to arbitrate "cannot in reason

be construed as allowing a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself." *Id.* at 1748. "[A]fter *Concepcion* and *Cruz* [*v. Cingular Wireless,* 648 F.3d 1205 (11th Cir.2011) ], courts may not invalidate arbitration agreements ... even if, as a practical matter, the class action waiver has a claim-suppressing effect." *In re Checking Account Overdraft Litig.,* 813 F.Supp.2d 1365 (S.D.Fla.2011) (internal quotations omitted).

The majority alleges that the class arbitration provision shields the title company from liability and provides Brewer no remedy because it is *"unlikely* that a consumer could retain counsel to pursue individual claims." Op. at 494 (emphasis added). The majority is attempting to give effect to the public policy it established in *Brewer I*—that class arbitration procedures are more desirable than individual arbitration. But in doing so, the majority creates a state law contract defense that attacks only arbitration clauses and inhibits their enforcement.

Creating a new "common law right" to an attorney; extending it to a right to class arbitration proceedings; and then using those two new rights as a contract defense just to strike agreements to arbitrate is "absolutely inconsistent" with the FAA and its goal of providing individual arbitration when parties contract for that remedy. Courts simply may not apply state public policy concerns to invalidate an arbitration agreement, even if the public policy at issue aims to prevent undesirable results to consumers. *Concepcion,* 131 S.Ct. at 1753 (rejecting the argument that small-dollar claims require class proceedings because states "cannot require a procedure that is inconsistent with the FAA."). The Supreme Court has made it

clear that a state public policy against enforcing arbitration agreements shall not influence a state court's unconscionability finding. *Marmet*, 565 U.S. ——, 132 S.Ct. at 1204 ("It is unclear, however, to what degree the state court's alternative holding [of unconscionability] was influenced by the invalid, categorical rule discussed above, the rule against predispute arbitration agreements.")

The majority tries to distinguish this case from *Concepcion* and come to a different conclusion by saying the contract at issue here is different than the agreement enforced in *Concepcion*. Under the contract in that case, the company defendant would pay costs of arbitration, pay double the plaintiff's attorneys' fees if the consumer recovered more than the last company offer in arbitration, and could not seek attorneys' fees incurred in defending the claim.

The rewards and attorneys' fees in the *Concepcion* contract, however, were never stated as requirements for finding the contract conscionable. Moreover, Missouri law already provides effective alternative remedies. The Missouri merchandising practices act allows a court to award a consumer attorneys' fees and punitive damages if appropriate.[10] While it may be generous for a company to contract as the company did in *Concepcion*, such a contract would create duplicate remedies in Missouri.

No evidence was presented showing that Brewer could not get an attorney to handle her case. In fact, the suit itself, with Brewer's counsel of record, proves the contrary. More importantly, such provisions in a contract provide no evidence as to the procedural conscionability of the contract at formation.

## IV. Conclusion

The majority's newly created right to an attorney for consumer claims morphs into a right to class arbitration proceedings, and then morphs into a right to void individual arbitration agreements altogether. While this is certainly clever lawyering, it is not the law and it openly flaunts the FAA and *Concepcion*. In this case, Brewer admits she did not read the contract and, although she knew of other lenders, she did not shop around for better terms and provisions. Despite the harsh terms of the contract she signed, it was her agreement. She was not cheated in its formation, and she should not be allowed to escape the contract's substantive provisions, including a provision to arbitrate, after receiving the benefits of the contract.

This case is nothing more than evidence of the majority's refusal to abide by controlling federal law because it disfavors the use of individual arbitration clauses in consumer contracts and prefers class action litigation that dramatically increases the cost and risk to the business community. These types of value decisions are more appropriately left to the legislative arena. In fact, those decisions were made by the United States Congress in the FAA and interpreted by the United States Supreme Court in *Concepcion*. It is our role to follow and apply the controlling law, not to engage in intellectual gymnastics to create "life after *Concepcion*.'"

---

10. "The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper." Section 407.025, RSMo Supp.2009.